[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action for dissolution of marriage returnable to the Waterbury Superior Court.
The plaintiff and defendant, whose maiden name was Lisa F. Reagan, were married at Southbury, Connecticut on April 26, 1993. Both of the parties have resided in Connecticut for at least twelve months prior to the date of this judgment.
There is one minor child issue of the marriage, namely, Caitlin Alexis Brostek, born December 1, 1993.
The court has the requisite jurisdiction to enter a judgment in this matter.
The Court has carefully considered the criteria set forth in Sections 46b-56, 46b-81, 46b-82 and 46b-84
of the Connecticut General Statutes in reaching the decisions reflected in the orders that follow.
The evidence presented at trial has clearly established the allegation that the marriage of the parties has irretrievable broken down. Judgment may enter dissolving the marriage on that ground.
Both parties are young, intelligent and articulate people. At the time of their marriage in 1993, the plaintiff was 23 and the defendant was 21.
At the time of trial the plaintiff-husband was 28 years old and in generally good health. He is a college graduate with a degree in economics. He is employed by CVS stores and is a manager in the company's Southbury store. He has been an employee of CVS for more than four years, including during the time period he resided with the defendant-wife in Pennsylvania.
His financial affidavit indicates that his gross weekly income at the time of trial was $695.00 per week, which netted CT Page 14274 him $439.00 per week. Reported deductions included a $104.00 per week contribution to a 401(k) plan. He testified that as a manager he can and does set his own hours. He had been assigning himself to weekend hours every three out of every four weekends and did so because it coincided with his court-ordered visitation with his daughter, Caitlin.
The defendant-wife was 26 years old at the time of trial. She is also a college graduate, although she had "put college on hold" and suspended her studies at the time of the marriage to help with the family income. During the marriage she worked at several clerical positions and at the time of trial was employed by Jaci Carroll Staffing Services as an administrative assistant. Her financial affidavit indicated that her gross weekly income from that employment was $400.00 per week which netted her $312.00 weekly. She enjoys generally good health.
The predominant issue in this trial was the claim by the plaintiff that the defendant, throughout the marriage and right through the trial, lacked the love, affection and selfless dedication necessary to be a good wife and mother. He offered evidence and testimony to establish that if she ever did possess those qualities they left her soon after their daughter Caitlin was born and that her claim that she has been and is a loving spouse and parent is merely a trial strategy to obtain custody. He testified that during the last year of the marriage she had become secretive, sullen, withdrawn and only minimally interested in caring for their daughter. She also started to party after work and often came home late without excuse or apology. The cornerstone of the plaintiff contentions was one very specific piece of evidence — an extremely personal and candid journal written by the defendant shortly before the parties separated in the fall of 1995 (Plaintiff Ex. 1). The defendant never denied that she wrote the entries which expressed her inner-most thoughts concerning the depression and dismay she was experiencing as she tried to be wife, mother and in-law. She testified that there were very good reasons why she felt that way at the time she wrote down her private thoughts on paper. Those reasons included, to a great extent, a pervasive involvement in the parties' lives by the plaintiff's family members — most specifically his mother. The defendant's subjective feelings were borne out by the unrefuted testimony concerning the parents' extraordinary role in caring for the party's daughter Caitlin. CT Page 14275
The plaintiff's parents (hereinafter referred to as the Brosteks) were the primary care-givers of the child starting three months after her birth when the defendant returned to her employment. The defendant testified that mother-in-law insisted on caring for the child during the day whiled the parties went to work. She testified that when she offered to arrange for a "three day/two day split" in day care, the plaintiff insisted that his mother do it exclusively and mother-in-law told her "its 100% care or nothing."
In February 1994 the plaintiff started an assistant manager's job with CVS and his schedule required him to work two evenings per week and three out of four weekends. When he did have time off from work, he took Caitlin to the Brosteks and rarely if ever stayed home alone with the child, according to the defendant.
In May, 1995 the parties purchased a home in Pennsylvania. The defendant moved into the home at that time, but the plaintiff's transfer to a CVS store in that state was delayed for a month or so. He remained behind in Connecticut — and so did the child, who stayed in the Brostek home. The plaintiff then joined the defendant in the new home, but the child didn't.
The child lived in the Brostek's home in Southbury all week, every week, and visited with the plaintiff and defendant — her parents — on weekends. The visits involved the Brosteks packing the child into their car on Fridays, driving her to the parties home in Pennsylvania for the weekend, and returning to get her and driving her back to Southbury every Sunday. Over time that routine was modified somewhat, including arrangements for the baby exchange to be done at a "midway" point. It was a display of total custodial commitment by the Brosteks and of total abdication of parental responsibility by the parties.
Based on that testimony alone, it is very easy to understand the plaintiff's claim that the defendant failed in her responsibilities as a mother, the defendant's claim that the in-laws were ubiquitous, possessive and controlling, and the mother-in-law's testimony that when and if the plaintiff was not available to care for the child, it was better that the child be with her (mother-in-law) rather than with the defendant-mother.
The reason given by the parties for the unorthodox interstate child care routine was that they had a very difficult time finding and agreeing upon a safe and appropriate day care CT Page 14276 provider in their community in Pennsylvania. The task was compounded by the fact that for much of that time the child was not potty trained and that severely limited the number of available day care programs. Almost predictably, the defendant testified that it was mother-in-law who repeatedly raised the spectre of unknown persons providing intimate toilette care to their little one.
The Brostek family increased its presence in the lives of the parties when the plaintiff's two sisters moved into the marital residence in August 1995 and stayed until the end of the year.
As with other incidents of Brostek family intervention, the plaintiff testified that the defendant did not either did not oppose the move or she acquiesced to it. The defendant testified that she was upset by the move and told the plaintiff but he never did anything in response.
The testimony of the plaintiff and defendant also differed sharply when it came to the facts surrounding the defendant's election to move out of their Pennsylvania home.
The plaintiff swore that in December 1995 he came back from a holiday trip to Connecticut and found the home devoid of almost all furnishings except the child's room. Not a stick of the child's furniture or personal effects were gone. Conspicuous by its absence was any "goodbye" note or other documentation explaining the defendant's departure.
The defendant testified that the reason there was no note or other written explanation of her removal from the home was because she and the plaintiff had discussed the fact she was leaving at some length days if not weeks before and he was well aware of her intentions. She offered to prove her version by introducing a distribution list of personal property which she and the plaintiff had negotiated in full contemplation of her leaving (Defendant's Ex. 18[1]).
She also testified that in November 1995 she started actively looking for a new place to live. She swore that she visited different places and finally signed a lease which she showed to the plaintiff. It specified a move in date of December 29, 1995.
The defendant moved to the residence of a boyfriend and, at the time, did little or nothing to change the grandparent custody CT Page 14277 routine in order to have her daughter come live with her.
She thereafter took up with another boyfriend and saw her daughter only on weekends.
The unrefuted testimony is that even prior to the date the defendant vacated the marital residence, the marriage of the parties was rapidly unraveling. The plaintiff's testimony was that neither he nor his family saw how anxious the defendant had become to extricate herself from "the family." He testified that he just happened to notice her diary entry laying innocuously on top of the television set opened to the passage that described her psychological diatribe against him, his family, marriage and motherhood. Freud says there are no mistakes.
The defendant testified that she increasingly tried to deal with her feelings and to communicate them to everyone concerned, but finally concluded that she had to leave.
Based on the evidence and testimony, the court finds that while she saw it as being warranted by "the whole family thing" which lead up to it, the defendant's conduct in vacating the home and becoming involved with other men was the primary cause of the breakdown of the marriage.
However, that is not to say that she automatically and irrevocably forfeited her rights and responsibilities as a parent.
The pendente lite orders awarded custody of the minor child to the plaintiff-father and visitation to the defendant-mother. The plaintiff and the child continued to resided in the Brostek home.
At the time of trial the defendant offered evidence and testimony to establish that while she did in fact flee from her responsibilities as wife and mother, she has long since regretted the way she dealt with the familial problems she had felt overwhelmed by and is now in a position to provide the high degree of love, affection and maternal care which her daughter not only needs but has a right to. The court believes her.
Additionally, the court finds that with the highest of motives — starting with true love and affection — the plaintiff's parents have found themselves to be Caitlin's primary CT Page 14278 care-givers. As idealistic as that may be, it is not in the child's best interest that such living arrangements continue as this little girl grows up. Custody of this child must be shared between her mother and her father as more specifically set forth in the orders which follow. Those orders are not intended to reward or punish either parent for the decisions which lead to the current living arrangements. They are orders which, based on the evidence and testimony, are in the best interest of the minor child.
ORDERS
I. DISSOLUTION OF MARRIAGE
Having found that the marriage has broken down irretrievably, the court here decrees that the marriage is dissolved and the parties are single and unmarried.
II. CUSTODY AND VISITATION
The parties shall share joint legal custody of their minor child, Caitlin. The child's primary physical residence shall be with the defendant-mother and the plaintiff-father shall have visitation as follows:
Alternate weekends from Friday after school (or 5:00 p. m. if non-school day) until Sunday at 7:00 p. m. In addition, plaintiff to have visitation from after school until 7:00 p. m. on two week-nights each week. Plaintiff's initial weekend visitation to be December 11-13, 1998.
Additionally, in 1998, plaintiff to have visitation with minor child on Thursday, December 24 from after school (or 5:00 p. m.) until 12:30 p. m. on December 25, except that defendant to have Christmas visitation with child from Friday, December 25 from 1:00 p. m. until 8:00 p. m. Child to be returned to plaintiff for remainder of weekend visitation. Parties are to alternate Christmas Eve and Christmas Day each year thereafter.
Parties are directed to stipulate to additional holiday or special event visitation. If they are unable to so stipulate, the matter shall be referred to the Family Services office of the Waterbury Superior Court for mediation.
The parties are free to modify visitation time as they may CT Page 14279 agree. Parties are to share equally the transportation responsibilities for visits.
The each parent shall have reasonable, unfettered telephone access to minor child when she is with the other parent.
III. CHILD SUPPORT
Pursuant to the support guidelines, the plaintiff is ordered to pay to the defendant child support the amount of $75.00 per week. The plaintiff is also ordered to provide medical insurance for the benefit of said minor child through his employment. The cost of such insurance shall be shared equally by the parties. Any uninsured or unreimbursed necessary medical or dental costs incurred for the benefit of the minor child shall be shared equally by the parties and shall be subject to the provisions of Section 46b-84(d) Conn. General Statutes.
IV. ALIMONY
Neither party shall pay periodic alimony to the other.
V. AS TO PROPERTY DISTRIBUTION
1. PERSONAL PROPERTY
Each party shall divide equally their personal possessions and house contents and furnishings. Plaintiff to return to defendant her wedding gown and defendant's Christmas ornaments. If the parties cannot agree as to distribution of personalty the matter shall be referred to the Family Services office of the Waterbury Superior Court for mediation.
VI. MISCELLANEOUS ORDERS
1. INSURANCE
Each party shall maintain a policy of insurance on their respective life in the amount of $1000,000.00 naming the minor child as the irrevocable beneficiary.
2. LIABILITIES
Each party shall be solely responsible for the liabilities appearing on their respective financial affidavits and shall CT Page 14280 indemnify and hold the other harmless thereon.
3. INCOME TAX
The parties shall annually alternate the dependency exemption for state and federal income tax purposes with the defendant being entitled to such exemption for 1998.
4. COUNSEL FEES
Each party shall be responsible for the payment of their respective counsel fees.
By the Court,
Joseph W. Doherty, Judge